IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Case No. 16-cv-107

| | |
|---|---|
| LANTERN BUSINESS CREDIT, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>ALIANZA TRINITY DEVELOPMENT GROUP, LLC, a Florida limited liability company, ALIANZA TRINITY HOLDINGS, LLC, a Florida limited liability company, BRIGHT'S CREEK GOLF CLUB, LLC, a North Carolina limited liability company, PASQUALE GIORDANO, and OMAR BOTERO,<br>           Defendants. | **AFFIDAVIT OF<br>OMAR BOTERO** |

Omar Botero, first being duly sworn, deposes and says as follows:

1. My name is Omar Botero. I am a defendant in the captioned matter. I am over the age of 18 and am otherwise competent to testify to the matters herein from my own personal knowledge.

2. I am a member-manager of the following entities (collectively, "the Companies"):

    (1) Bright's Creek Golf Club, LLC ("BCGC");

    (2) Alianza Trinity Development Group, LLC ("ATDG"); and

    (3) Alianza Trinity Holdings, LLC ("ATH").

3. In addition to my roles with the Companies, I am also a guarantor and individual defendant in this action.

4. While I am a citizen and resident of the State of Florida, I am frequently on site at Bright's Creek and am deeply familiar with its assets and operations.

5. The Companies are currently under contract to sell the majority of their assets to a third party purchaser, Legacy BC, LLC ("Legacy").

6. James Hall is a manager of Legacy. He has provided a separate affidavit about the purchase.

7. Attached hereto as Exhibit 1 is a copy of the Assets Purchase and Sale Agreement ("the Purchase Agreement") which I have executed on behalf of the Companies and which Mr. Hall has executed on behalf of Legacy.

8. As set forth in the Purchase Agreement, the Companies are the owners of a development project containing residential lots, a golf course, and related amenities in Polk and Henderson Counties in the State of North Carolina. These are the assets Legacy has contracted to purchase.

9. The attached Purchase Agreement was executed on or about 26 April 2016. The Purchase Agreement includes a due diligence phase to be completed by 26 May 2016 as provided in Article VI. If the buyer does not terminate the Agreement during the due diligence period, it "shall be deemed accepted by the Parties." An extension is possible, but only if an appraiser is responsible for the delay and has been engaged within five (5) days of the beginning of the due diligence period, and then the extension would be up to 5 days after the completion of the appraisal.

10. Article VII.A.(2) includes warranties that the sellers not have judgments or decrees which would impair the ability to consummate the transaction. An order of receivership or a completed foreclosure sale would likely cause this warranty to be breached and cause the Purchase Agreement not to close.

11. Likewise, the closing cannot require governmental or court consent, or consent by any other person or entity, which would presumably include a receiver. *See* Article VII.A.3(vi). As with other warranties, a breach would likely cause the Purchase Agreement not to close.

12. Other provisions involving legal proceedings affecting the possible sale include paragraph VII.A.47 and present similar exposure to breaches of warranties.

13. An injunction from the Court limiting the power of the Companies to engage in the transaction described in the Purchase Agreement could allow for termination by the buyer under Article XIII.A.2.

14. The Purchase Agreement contemplates several payments prior to closing. For instance, the original payment toward the initial purchase price of $50,000 as required by Article II.C.1 has been paid to an escrow agent. An additional $100,000 second deposit is due within five (5) days of the end of the due diligence period under Article II.C.2, or by 26 May 2016. Finally, under Article II.C.3, cash at closing is required to be paid no later than two weeks following the end of the due diligence period, or by 9 June 2016. This provision includes retirement of all outstanding liabilities

(including to Lantern) to be listed in a verified roster of debts as of the time of closing, plus $8 million at the Sellers' direction, which would be payable in proper proportion to the members of the Companies.

15. In summary, based upon the current state of due diligence, we expect to close on a sale to Legacy in the month of June 2016.

16. An additional problem created by a potential receivership is how operations are currently funded. As shown in other papers being filed with the Court, Lantern transferred funds which had been set aside for development expenses on the Bright's Creek project from the Development Reserve Account to the Interest Reserve Account, which is used to fund advance payments of interest to Lantern that are not yet due. Lantern took that action on or around 4 January 2016, leading to our current predicament. Lantern also took $681,573 from the Development Reserve Account to pay down principal on its loan to the Borrowers when such principal payments were not yet due. As a result of these transfers, our business was deprived of funds to operate, resulting in an inability to pay insurance, which is being resolved. We have sought and procured new insurance without the double coverage requirements dictated by Lantern. Our current sources of capital include friends and family members and affiliated companies. They are not going to provide additional funding required to maintain operations if the operations are in fact in someone else's control.

17. In order to be able to resume our work, we had to secure funding from private sources. A total of $648,000 has been infused in the Companies by various parties to be able to complete our work during the due diligence phase and to operate through the time needed to close with Legacy. Appointment of a receiver could take monies provided by others for the Companies away from their intended purposes, as described above, and put those funds in the hands of a receiver on what would then likely become a collapsing business. If a receiver is appointed, it could cause the legal consequences discussed in paragraph 10 - 13, as described above, to be invoked. Nothing could be worse for our business, employees, creditors, investors, and potential purchaser than such a change. The immediate degradation of our business and the value of its assets by appointment of a receiver, includes the possibility of a collapse in value to fire sale levels. Given that the purchase price for the Assets, in accordance with the Asset Purchase Agreement, is to be determined by independent appraisal, the collapse of the values to fire sale levels would have devastating effects, which would be measured in the millions of dollars.

18. Subjecting the business to a completed foreclosure or to receivership proceedings during the due diligence time period or otherwise in advance of closing as discussed in this affidavit would likely chill the purchase due to title and other problems. In addition, the possibility of the purchaser's investment value being impaired while having to work through receivership

and foreclosure issues would likely result in a refusal to close. It has taken us more than two years to execute a successful turnaround of Bright's Creek, and build up the values of the community and its lots to their current standing. The average sales price in 2015 was $174,000 per lot, almost 40% higher the average from the prior year. Furthermore, the company has expended tremendous effort, time and money securing strategic relationship with top level, world renowned brands such as BMW, Beretta, Marriott, and others, all of which are brands that are extremely careful about whom they associate with. Foreclosure and receivership would undoubtedly put those contractual relations in jeopardy, further diminishing the value of the overall assets and the community's brand itself, thus eliminating all of the progress of the last two years. It is certain that the purchaser will not want that to happen to the assets it intends to purchase, nor does it want a devastated brand.

19. Other issues essential to the success of our organization that a receivership or a foreclosure could impair include the impact on an option to purchase adjacent land important to our development and which has already been made part of our Master Plan. Attached hereto as Exhibit 2 is a copy of the Amended and Restated Real Property Option Agreement ("the Option") by and between Alianza Trinity Development Group, LLC and Hidden Springs Holdings, LLC, a North Carolina limited liability company ("Hidden Springs") which owns the adjacent property. Under Section 29 of the Option, Hidden Springs can terminate the Option if a

legal order is entered prohibiting the option transaction or if foreclosure proceedings have been instituted and protective action is not taken to preserve the Option. Hidden Springs is supporting our continuing involvement in the project, and we do not believe it will cancel the Option due to the foreclosure having been filed so long as we are in control of Bright's Creek. The loss of the Option also creates potential for catastrophe in the long term plans that a purchaser such as Legacy would likely have as part of its own goals, such as to exercise the Option in order to complete the development under the Master Plan. The Option represents almost half of the present and more than two-thirds of the future value of the Project, and without it, the sale to Legacy would not go forward. According with the approved Master-Plan, Bright's Creek may develop an additional 900 single family lots on the optioned land, as well as a Gun Club, and numerous other commercial activities. At the 2015 average sale price of $174,000 per single family lot, it would represent a potential loss of at least $156 million. The amount is likely to be higher, as the last lot sold at Bright's Creek sold for $220,000. We expect that to be the average for 2016.

20. Beyond these topics, other risks exist if receivership or an order for preliminary injunction limiting our operational autonomy is entered. Lantern's very curious timing for executing this attack on our assets and operations leaves one to wonder: knowing full well the seasonality trends of Polk County as they relate to real estate sales, why is it acting now?

Based on our experience in acquiring the property, developing the project, and managing the business in this area, I know that sales slow down to a virtual crawl during the winter months of December, January, February and even March. It is implausible for Lantern to complain of a surprising lack of sales when it knows the seasonal nature of this business. Without a financial default -- Lantern has been paid everything it is owed -- it filed for foreclosure exactly when the sales season is set to begin. The sales in the area are historically highest from May through November, as also learned during our experience in acquiring the property, developing the project, and managing the business. All of the preparations for taking full advantage of the season, including securing a contract with Premier Sotheby's (the largest and most successful Sotheby's in the world); working through the transition period and retraining new sales team; engaging a new marketing, Public Relations and sales support staff; designing and deploying new web sites and digital marketing efforts; all in preparation for the deployment of the sales season. These efforts face being completely obliterated by the foreclosure action, and would be further damaged by a receivership. We are fighting both. The foreclosure has been continued, *see* Exhibit 3, attached order of continuance, and we do not believe the foreclosure can go forward absent financial default. Finally, I want to be clear: we are in the business of selling land, single family lots, which are the main source of income to the business, and the primary source of repayment to our lenders. The Club dues and

consumption revenues do not provide that level of income yet, and a lot more land and memberships have to be sold before it does. Premier Sotheby's is the absolute best Sotheby's Organization in the world, having outperformed all other Sotheby's groups consistently. They have a primary focus on the Southeastern United States, which is our primary target market for first and second home buyers. Premier Sotheby's has more than 35 offices and more than 1,200 agents in these markets. It has a strong presence in North Carolina, with offices in Charlotte, Lake Norman, Banner Elk, Ashville, and equally important to us, in Greenville South Carolina. Foreclosure and receivership will cause the probable loss of the agreement with Premier Sotheby's, since it only promotes high-end projects with strong brand value and unique market positioning. Going forward with a receivership would have devastating effects since a new team would have to be hired again, a new transition period would be required, a marketing team would have to be retrained, and more than likely we would miss the majority of the sales season for 2016. This sort of collapse would also cause our buyer not to go forward with the closing as it would inherit the same setbacks.

Further affiant saith not.

This the 23 day of May, 2016.

_____
OMAR BOTERO

STATE OF North Carolina

COUNTY OF Polk

SWORN TO AND SUBSCRIBED before me,

this the 23 day of May, 2016.

_Shaula P. Dinsmore_
Notary Public    Shaula P. Dinsmore

My Commission Expires: 6-28-2020

*[Notary Seal: SHAULA P DINSMORE, NOTARY PUBLIC, POLK COUNTY, NC]*

# CERTIFICATE OF SERVICE

      This is to certify that the foregoing **AFFIDAVIT OF OMAR BOTERO** was served upon the plaintiff in this action in accordance with the provisions of Rule 5 of the Federal Rules of Civil Procedure via the ECF system, addressed to its counsel of record, in cases in which they appear, as follows:

                neale.johnson@smithmoorelaw.com
                Neale T. Johnson

                manning.connors@smithmoorelaw.com
                Manning A. Connors

                Smith Moore Leatherwood LLP
                300 N. Greene Street, Suite 1400
                Greensboro, NC 27401
                Attorney for Plaintiff

This the 23rd of May, 2016.

                */s/ Edward L. Bleynat, Jr. [SB#16558]*
                Edward L. Bleynat, Jr.
                FERIKES & BLEYNAT, PLLC
                48 Patton Avenue, 3rd Floor
                Asheville, NC 28801
                Tele: (828) 251-1588
                Fax:  (828) 251-2214